Case number 16-5181, Ghulam Ali Appellant v. E. Scott Pruitt Administrator, United States Environmental Protection Agency Mr. Pugh for the amicus curiae, Mr. Tate for the affiliate May it please the Court. Good morning. Your Honors, good morning. On behalf of the amicus, we represent Mr. Ali on two particular issues as put forward in our brief. In the core of the matter, we believe, Your Honors, is that we believe that the district court decided this case prematurely and against the required summary judgment standard when it drew important inferences against Mr. Ali. As Your Honors very well know, pre-discovery motions for summary judgment, which is how this case was decided and is before you now, are generally disfavored. There are two issues that we see in this case as we put forward in our brief. Can you address just whether we have jurisdiction to hear this case? Yes, Your Honor. Given the timing of the filing of the notice of appeal here. We certainly can, Your Honor. We believe that the notice was timely filed and to the government's credit has conceded the point. There was a question of which order was the final order. And as we put forward, the April judgment from the court was the final order. We briefed it extensively in our opening brief, and I'd be happy to go into detail. I just have a question about it. I mean, our cases say that it depends on our reading of the intent of the judge. And it appears to be the case that we read the intent of the judge in the first order in the light of what the judge said in the second order. And that's a little odd in terms of most interpretive canons. I mean, you'll find a long line of cases where we disparage post-enactment legislative history. And the same is true in contract. So I don't necessarily disagree with the outcome here. And looking for intent may be different from looking for meaning. It certainly is in some contexts. But do we need, in this case, do we need the second order to give the interpretation that both parties advocate for the first order, namely that it's not final? Your Honor, we do believe that we do need the second order because the first one, the March 31st one, says that this action will be dismissed. And then that came, of course, in the April 12th order. So there was – You're saying will be means is radically different from is. That is, yes, Your Honor. Yeah, yeah, yeah. And in light of the language in the April 12th order, to Your Honor's point, yes, we believe the April 12th order shows what the judge's intent was here, which is to dismiss it with finality on April 12th. The other point, the other issue that we've raised, of course, is that we don't see this as a case where the plaintiff seeking a reasonable accommodation abandoned his attempt to receive a reasonable accommodation. In fact, Your Honor, this is set forth pretty clearly in our brief and in Mr. Ali's. There are letters, April 2007 letters, for example, where Mr. Ali has sent his doctor's opinion about what he needs, answering questions from the EPA that the EPA never responded to. Those – and – But what about the correspondence from Mr. Ali explicitly saying that he was going to pursue this other avenue to seek redress, basically? Your Honor, we believe that the record read in Mr. Ali's favor, as it should, is that he and his supervisor met with the reasonable accommodation coordinator, Mr. Hague, I believe it was June or July. And at that point, he was informed that there's another route. He believed it was suggested to him that he should pursue that route. And in his note to the reasonable accommodation coordinator, he said, I'm pursuing that other route, implying that he's doing it per the meeting that they had. And what is so important here, and we don't believe that the EPA is focused on it enough, is that he didn't say, I'm abandoning this process. He said that, thank you for your patience. I'm pursuing – paraphrasing – I'm pursuing this other process for now. And in fact, the EPA – there's been a lot of distinction between the AWS process and the reasonable accommodation process, but at the end of the day, the question is, did the employer have the notice it needed to know that it had an employee who needed an accommodation and the reasons for that? Well, I didn't see in your brief, and I missed it, a claim that the request for additional information was not a reasonable request. If it's a reasonable request, why shouldn't we expect – why shouldn't we answer, or at least have an effort to answer it, thereby continuing the iterative process? Your Honors, if it was not clear, I apologize. In our brief, certainly between Mr. Arliz and our brief, we've stated that we believe that the request was – actually requested information that it already had. We believe that, critically, the April letters in combination with the evidence from 2000 and their day-to-day interactions with this employee from 2000 to 2007, knowing that an office really helped him, gave them the information they needed to know that an office was, in fact, the accommodation that would remedy his disability. So one thing I wasn't quite following is that everybody seems to be on a common understanding that there's two different potential processes. There's the AWS process and there's the reasonable accommodation process. And even if it's true that what happened was resort to the AWS process initially was meant only to suspend the reasonable accommodation process rather than abandon it, it still seems like what happened at the end of the day is a lawsuit was filed before the reasonable accommodation process came to a close. And so at that point, don't we have to address whether reasonable accommodation was denied by reference to the time when the lawsuit was filed? And at the time that the lawsuit was filed, the request for further information still hadn't been answered. The notion that there could be a release to communicate directly with the doctor hadn't been supplied. And so we're faced, and the district was faced, I think, with dealing with the circumstance in which Mr. Ali filed a lawsuit before participating in the interactive process in a way that the correspondence from the EPA asked him to. Judge, we believe that Mr. Ali, by the time he saw an EEO counselor, had no choice but to do so because in November of 2006, he submitted a letter, again, to his employer telling them this is my condition. No response. In March of 2007, he literally had a breakdown a week after he was put into a cubicle. Again, the response is go to the ER, but we are not going to change this condition. We're not going to give you an office. And then by the time April comes, he submits not one but two letters where he's, again, from doctors, current diagnoses that states that this was his problem. By this point, Your Honor, we believe that the EPA should have responded. And so we don't believe that he, unlike cases like Ward or others, jumped the gun and ended the process. And we don't believe that the district court found that either. We believe that the district court believed that the questions that the EPA answered were not answered. Respectfully, we believe that they were. Your Honor, I've reserved two minutes of my time, but I'm happy to answer any questions now that are needed. We'll give you a little time. Thank you. Thank you. Thank you, Your Honor. May it please the Court. Damon Tate for the defendant. I think on the jurisdictional point, defendant agrees with amicus for better or worse. It's a bit of a messy record, but we do think that when the two orders are read in conjunction, at least the intent of the district court is clear and that under the score's precedence, ultimately it's that intent that governs here. So we do think that the Court has jurisdiction. Is intent different from meaning? I'm sorry? Is intent different from meaning as it is in constitutional law? It might be. If the district court intended something that's clearly in contradiction with what it wrote on, that might be a different question than we're faced with here. But I think what we're faced with here is maybe a latently ambiguous initial first order that says will be issued, a final order will be issued. And so in light of the fact that a final order subsequently was issued, then that clarifies what was clear, what the ultimate intent was in this case. What, if any, effect should we give the fact that there had been an admonishment in St. Mark's that we discouraged these types of orders? I believe that's up to the Court to decide how to interpret that admonishment in terms of whether a district court complied with the Court's instructions or not. But even in light of that admonishment, I think here that the district court was trying to be clear. It said that a final order will issue, and then a final order did issue in direct connection with an opinion that resolved all the outstanding issues. And that second order was quite explicit that it was intended to be a final order. So in this case, it's not what happens sometimes where a judge will issue an order saying that an opinion will issue and then months or years go by. This was a fairly well-connected process in which the district court's intent was clear. It was sufficiently clear, in fact, that we didn't even make an argument that there wasn't jurisdiction until the Court ordered us to brief that issue. But I think that this is a case in which there's sufficient clarity that the Court shouldn't deny jurisdiction. On the interactive process point, I think this Court's language in Ward is really directly applicable here and largely resolves the case, which is the Court said, quote, the interactive process broke down before the agency decided on plaintiff's request, and no reasonable juror could have found that the agency, rather than the plaintiff, was responsible for the breakdown. That's quite literally what we're faced with here because, as Judge Williams noted, there were six presumptively reasonable requests for clarification and further medical information. And the agency did hear, frankly, quite a lot. Not only did they give very specific instructions as to what they were looking for, but Mr. Hague followed up not once but twice over the course of months specifically saying, would you please provide us with this information, and Mr. Ali refused to do so. There's some notion raised on appeal by amicus that Mr. Ali didn't do so because he was merely suspending the process in favor of AWS. That's not an argument that Mr. Ali made below, and, indeed, he doesn't even make it on appeal. Instead, his argument is that he did not need to provide additional medical information because, number one, the agency had enough, and, number two, because Mr. Hague, who is the reasonable accommodation coordinator, wasn't entitled to it because he wasn't a doctor. And even accounting for the fact that Mr. Ali is pro se, that approach simply finds no support in this Court's case law, and it's impractical because if the agency reasonably needs the information to tailor a reasonable accommodation, then it should have it following a specific request for it. And, notably, the things that were requested raised such questions as what effect does or do currently used mitigating measures have, and what reasonable accommodations, plural, might you suggest, and those questions are not ones to which the agency had answers. There was no evidence at all prior to this request, or, indeed, after it because it wasn't responded to, as to what mitigating measures Mr. Ali was taking or could take. And under this Court's CAPG decision, that's quite relevant. Likewise, although it's true that the agency must provide a reasonable accommodation if it can, after a showing of need, a claimant is not necessarily entitled to the specific reasonable accommodation he requested. Here, an office, it said he's entitled to a reasonable accommodation, and one could have imagined several. A private office may be one. Working somewhere else that's more isolated may be another. Working from home might be a third. And in order for the agency to decide among potential reasonable accommodations, the answers to these questions were necessary. And if they weren't necessary, then Mr. Ali, at some point, could have made that argument, but it's not one that he or respectful of. What if we concluded that it's fairly before us whether there was suspension rather than an abandonment, and that really what's going on is Mr. Ali responds and says, you know, for now I'm going to go with the AWS process. I understand there's a reasonable accommodation process, too, but the AWS process worked for me last time. I'm going to pursue that to its conclusion, and then we'll turn back to the reasonable accommodation process. By the time, I think, as Your Honor's earlier question to opposing counsel hinted, by the time the suit was filed, Mr. Ali had not responded to their request for more medical information, specifically the answer to these questions. So even if it was the case that Mr. Ali was pursuing AWS in lieu of reasonable accommodation, he didn't provide answers to the questions under either process, and then he sued for failure to reasonably accommodate without having provided the answers that the agency was looking for. Now, I think the hardest issue in this case is, as amicus notes, whether it was premature to resolve this case without discovery, and I think the answer to that question is no. This court's decision in guard actually goes straight to that because in guard, the district court faced a situation much like this one where a plaintiff had a non-obvious alleged disability, chronic pain, narcolepsy, PTSD. So it wasn't like somebody in a wheelchair, and it was clear from the face of the complaint there that there had been, at least allegedly, prior medical information provided, and the agency had said, please give us more recent information, something from the last few months, and it was also clear that the claimant hadn't done so. So not only did that court not allow discovery to go forward, it actually granted a motion to dismiss. And this court, it's true, summarily affirmed it in a non-precedential opinion, but I don't think that means that the disposition doesn't have value, because a summary affirmance means that the merits are so clear that more briefing is not needed. And in summarily affirming, the court said that it's established beyond the need for more briefing that a reasonable request for current medical information is required. So that seems to be exactly what we're faced with here, where the agency sought reasonable clarifications of certain limited points, and when it didn't receive it, reached out not once but twice. And it's also worth noting in that regard that the agency in general, and Mr. Hague in particular, had been down this road only a year before. In 2005, much like in 2006, Mr. Ali had gone to Mr. Hague and sought reasonable accommodation, and Mr. Hague asked for certain information, and Mr. Ali didn't provide it. And Mr. Hague reached out a couple more times and then closed his file. Then the same thing happened a year later in 2006. The reiteration of these exchanges is important, but is it not the case that at any time, including today, Mr. Ali could not start the process again on a fresh slate? It's absolutely the case. That's shown in 2005. He didn't get it and restarted it in 2006. So I think an important point here is that the abandonment issue is not the same as abandoning a claim that might be dismissed with prejudice in a lawsuit. Closing a reasonable accommodation file is not prejudicial in a way that dismissing a case might be. Mr. Ali could have at any time, including after filing this complaint, provided the information in question and restarted the process. He's not limited in doing that in any respect. The only question is, by the time Mr. Ali filed this case in March 2007, had he suspended or abandoned the process in such a way that the agency could be found not to have participated in good faith? We think the answer to that question is quite clear, and the district court got it right, and that's the basis on which we seek affirmance. Thank you. Thank you. Mr. Peay, we'll give you your two minutes of rebuttal. Yes, thank you. Your Honor, the argument from my opponent highlights the issues that we raised in the beginning of our argument today, and they're still, as the EPA is, still ignoring the fact that there were April 2000 letters that were submitted by Mr. Ali that answered the six questions, if inferences are fairly drawn in his favor, answered the six questions that the EPA asked. So the repeated arguments that he didn't answer those questions is just flatly wrong, and, in fact, the district court acknowledged that he had, in fact, sent in those April letters in page 37 of the decision. But what happened there is because there's no response from the EPA to those letters, the judge on the court's own decided that those letters were insufficient. And just briefly, what those letters tell you is that there's shortness in wheezing, that he receives a rash. The agency already knew since 2000 that he had had these problems, these limitations, in fact, since 1997, that the perfumes and other odors from his office mates were causing the problem, and that, again, to the EPA's question of what would remedy this problem, the judge in April 2007 says a private office would do that. Now, what, though, in the record supports that a private office is going to do that when, I mean, the air in the building is the air in the building. It's going to be the same air in a private office that there would be outside the office in a cubicle. For this, Your Honor, we believe that, frankly, Mr. Ali should have an opportunity to show that, but the central question of whether there was an abandonment, we believe the answer to that is no for the reasons stated. So, Your Honor, I see that my time has passed. I'm happy to continue. Well, I guess to determine whether there was an abandonment, we would have to, I guess, interpret whether that response and the others were really responsive. So I guess that's what I'm trying to get at with my question is how was that really responsive, you know, how did that really answer the question of how a private room would, you know, achieve some sort of a remedy for the problem that Mr. Ali says that he had? We believe that the EPA answered the letters that were provided. That part of the interactive process could have continued. The question that's asked by the EPA is what accommodation do you need, not why. In other words, the very last question that they ask of the sick is what reasonable accommodation is needed. And the letter that is provided by the doctor invites the EPA to contact the doctor. In addition, Mr. Ali is in communication regularly with the recipient of the letters, his first-line supervisor, Mr. Wathen, who's walked with him through the reasonable accommodation process and the AWS process, but for some reason there is nothing on record that contains a response from the EPA to what Mr. Ali presented in response to these questions. With that, Your Honor, thank you for your time. Thank you. Mr. Peay, you were appointed by the court to present arguments in favor of Appellant, and the court appreciates your assistance. Thank you, Judge. Thank you. The case is submitted.
judges: Srinivasan, Wilkins, Williams